# EXHIBIT 2

# First Amended Complaint, dated June 27, 2022

KAPLAN COTTNER
KORY L. KAPLAN, ESQ.
Nevada Bar No. 13164
Email: kory@kaplancottner.com
10091 Park Run Drive, Suite 190
Las Vegas, Nevada 89145
Telephone: (702) 381-8888
Facsimile: (702) 832-5559

BROWN, CLARK, LE, AMES, STEDMAN & CEVALLOS LLP
Edwin B. Brown (Appearing *Pro Hac Vice*)
22342 Avenida Empresa, Suite 125
Rancho Santa Margarita, CA 92688
Phone: (949) 459-5900 Fax: (949) 713-7722
Email: edbrownlaw@gmail.com

*Attorneys for Plaintiff George Jaramillo*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| GEORGE JARAMILLO, an Individual<br><br>Plaintiff,<br><br>vs.<br><br>AREA 15 LAS VEGAS LLC, a Delaware Limited Liability Company, AREA 15 GLOBAL LLC, a Delaware Limited Liability Company, KENNETH FISHER, an Individual, STEVEN FISHER, an Individual, WINSTON FISHER, an Individual, FISHER BROTHERS MANAGEMENT CO. LLC, a New York Limited Liability Company, FISHER BROTHERS FINANCIAL AND DEVELOPMENT COMPANY LLC, a New York Limited Liability Company, and DOES 1-50 Inclusive,<br><br>Defendants. | **Case No.: 2:21-cv-00891-RFB-BNW**<br><br>**AMENDED COMPLAINT FOR:**<br><br>1. **DISCRIMINATION BASED ON RACE (42 .S.C. § 2000E-2);**<br>2. **DISCRIMINATION BASED ON SEXUAL ORIENTATION (42 U.S.C. § 2000E-2);**<br>3. **HOSTILE WORK ENVIRONMENT;**<br>4. **RETALIATION;**<br>5. **WRONGFUL TERMINATION;**<br>6. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>7. **DISCRIMINATION (NRS § 613.330)**<br>8. **DISCRIMINATION (Race) (42 U.S.C. §1981)**<br>9. **FRAUD**<br>10. **DEFAMATION PER SE;**<br>11. **BREACH OF CONTRACT; and**<br>12. **CONVERSION** |

**AMENDED COMPLAINT**

1

Exhibit 2 - Page 2 of 34

Plaintiff GEORGE JARAMILLO (hereafter "Mr. Jaramillo") for his Amended Complaint complains and alleges against Defendants AREA 15 LAS VEGAS LLC, AREA 15 GLOBAL LLC (collectively "AREA 15"), KENNETH FISHER, STEVEN FISHER, WINSTON FISHER (collectively FB Individuals), FISHER BROTHERS MANAGEMENT CO. LLC (hereafter "Fisher Brothers Management"), FISHER BROTHERS FINANCIAL AND DEVELOPMENT COMPANY LLC (hereafter "Fisher Brothers Financial") (the two Fisher Brothers entities are hereafter referred to as "Fisher Brothers"), and DOES 1-50, inclusive (collectively "Defendants"), as follows:

## JURISDICTION AND VENUE

1.     This is a civil complaint brought by George Jaramillo in the United States District Court under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by 42 U.S.C. 2000e-2 *et. seq.* and the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, federal statutes prohibiting discrimination in order to secure protection and redress deprivation of Mr. Jaramillo's rights under these laws. Jurisdiction of this Court is therefore invoked under 28 U.S.C. 1331.

2.     This action also includes claims arising out of Nevada anti-discrimination statutes, Nevada Revised Statutes ("NRS") 613.310 *et. seq.* Jurisdiction is also proper pursuant to NRS 14.065. The state claims are joined pursuant to the doctrine of supplemental jurisdiction and 28 U.S.C. 1367(a).

3.     Mr. Jaramillo asserts that he was subjected to discrimination and was treated disparately and subjected to a hostile work environment and retaliation due to his race and sexual orientation, which is strictly prohibited under Title VII, Section 1981 and NRS 613.310.

4.     As Mr. Jaramillo's employers during the relevant time period, Defendants conducted business regularly and systematically in Clark County, Nevada. Defendants' improper conduct at issue occurred in whole or in part in Clark County, Nevada, and engaged in an industry affecting commerce. Thus, pursuant to 28 U.S.C. 1391(b)(1), 28 U.S.C. 1391(b)(2), 28 U.S.C. 1391(c)(1) and 28 U.S.C. 1391(c)(2), venue is proper in the United States District Court for the District of Nevada.

5.     Mr. Jaramillo filed his Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on March 18, 2021.

**AMENDED COMPLAINT**

2

6.      Mr. Jaramillo received a copy of his "Notice of Suit Rights" from the EEOC on March 23, 2021. Mr. Jaramillo is in fulfillment of all jurisdictional requirements, including filing of this lawsuit within ninety (90) days of his receipt of the Notice of Suit Rights.

## THE PARTIES

7.      Mr. Jaramillo is a gay, Hispanic male. At all times herein mentioned, he is and was a resident of the County of Clark, State of Nevada.

8.      Defendants own and/or operate "AREA 15," a retail and entertainment complex located at 3215 S. Rancho Drive, Las Vegas, Nevada 89102.

9.      At all times herein mentioned, Defendant AREA 15 Las Vegas LLC and AREA 15 Global LLC (collectively "AREA 15") are limited liability companies formed in Delaware and licensed to do business in Clark County, Nevada.

10.     At all times herein mentioned, Defendants Fisher Brothers Management and Fisher Brothers Financial were New York limited liability companies and were the owners and/or managing entities for Defendant AREA 15.

11.     At all times herein mentioned, Defendants Kenneth Fisher, Steven Fisher, and Winston Fisher ("FB Individuals") were owners and managers of Fisher Brothers Management and Fisher Brothers Financial.

12.     At all times herein mentioned, Defendants were the agents, servants, and employees of each other and, at all times pertinent hereto, were acting within the course and scope of their authority as agents, servants, and/or employees, and acting on implied and actual permission and consent.

## FISHER BROTHERS ACTIVELY PARTICIPATED IN THE MANAGEMENT AND CONTROL OF THE ACTIONS OF AREA 15

13.     Defendants Fisher Brothers Management and Fisher Brothers Financial controlled AREA 15. Indeed, in an announcement, Fisher Brothers advised the public that, "AREA 15 represents a collaborative venture between real estate development firm Fisher Brothers and creative agency Beneville Studios, both of New York."

14.     Fisher Brothers' executives held out **AREA 15 as part of the Fisher Brothers group**. Fisher Brothers' control of AREA 15 is confirmed by AREA 15's Organization Structure chart and other documents.

**AMENDED COMPLAINT**

3

15. Fisher Brothers, through the Defendant FB Individuals, managed the critical business activities of AREA 15, including but not limited to as follows:

A. **Fisher Brothers' IT team handled all of the IT needs for AREA 15**.

B. **Fisher Brothers assumed the role of training AREA 15 employees**.

C. **Fisher Brothers controlled the process of obtaining AREA 15's Nevada liquor license.**

D. **Fisher Brothers controlled the human resources for AREA 15**.

E. **Fisher Brothers controlled the Internet network infrastructure for AREA 15**.

F. **AREA 15's lease agreements were signed by Winston Fisher and Kenneth Fisher**. Therefore, Kenneth Fisher's statement in his declaration in support of Defendants' Motion to Dismiss, was **false** wherein he stated, "My role as a vice president of Area 15 LV is no more than a formality and I have no specific duties or authority in or with respect to Area 15 LV."

G. **Defendant FB Individuals communicated and advised each other on AREA 15 operational matters**.

H. **Defendant Steven Fisher was involved in AREA 15 budget meetings** and posed questions to AREA 15 employees regarding AREA 15's budget.

16. **Thus, Defendants Kenneth Fisher, Steven Fisher, and Winston Fisher were actively involved in the management and control of AREA 15**.

17. Susan Dalton, director of human resources for the Fisher Entities, handled Mr. Jaramillo's application, background check, and onboarding. She did this from the Fisher Entities' New York offices. She handled this for each employee that Mr. Jaramillo hired once he started working at AREA 15, and did so for the entirety of his tenure with the company.

18. When Defendants hired Mr. Jaramillo, they sent him an offer letter that had the names of the Fisher Entities prominently displayed. He was placed on the Fisher Entities' 401(k) plan and health benefits. Additionally, all AREA 15 expenses were required to be submitted to the Fisher Entities for reimbursement.

19. Mr. Jaramillo was always told that the Fisher Entities were owners of AREA 15. The Fisher Entities' own website (https://www.fisherbrothers.com/properties/area15) (last visited September 10, 2021) identifies AREA 15 as one of its properties and defines AREA 15 as a

**AMENDED COMPLAINT**

4

Exhibit 2 - Page 5 of 34

"collaborative venture between real estate development firm Fisher Brothers and creative agency Beneville Studios, both of New York."

20. When AREA 15 employees gave tours of the AREA 15 facility, they were instructed to tell everyone that the Fisher Family and Fisher Entities controlled the facility. The City of Las Vegas complained constantly that "this isn't New York," and that it was hard to work with AREA 15 because of the New York City team's interference. It was common knowledge that the New York City team impeded AREA 15's efforts in Las Vegas.

21. In the performance of Mr. Jaramillo's job duties, he was directed by the Fisher Entities, answered to the Fisher Entities, was governed by the Fisher Entities, and directly communicated with the Fisher Entities, including but not limited to the following individuals and their respective job titles:

**Philip Brohn**: Senior Executive for the Fisher Entities and Design and Construction Manager for AREA 15.

**Ari Moses**: Director of Investments for the Fisher Entities and a board member of AREA 15.

**Clara Chen**: Property Controller for the Fisher Entities and Accountant for AREA 15.

**Clark Briffel**: Director of Leasing for the Fisher Entities and AREA 15.

**Cliff Spierer**: Chief Financial Officer for the Fisher Entities.

**Sam Rosenberg**: Chief Financial Officer for the Fisher Entities.

**Petronela Digeratu**: Corporate employee for the Fisher Entities.

**Susan Dalton**: Director of Human Resources for the Fisher Entities and AREA 15.

**Winston Fisher**: Chief Executive Officer of AREA 15 and Partner of the Fisher Entities.

**Martin Edelman**: Partner of the Fisher Entities.

**Jitendra Jain**: Director of Development for the Fisher Entities, who oversaw the development, design, and construction of AREA 15.

**Stephanie Roney**: Acquisitions and Development Analyst for the Fisher Entities and Project Manager for AREA 15.

**AMENDED COMPLAINT**

5

**Katie Liu**: Fisher Entities information technology ("IT") director, who oversaw all AREA 15 IT matters.

22.     **Winston Fisher** consulted with **Kenneth Fisher**, and others, regarding post-COVID safety for AREA 15.

23.     **Kenneth Fisher and Winston Fisher received weekly status reports** regarding AREA 15 issues. These status reports led to dialogues between the FB Individual Defendants regarding management of AREA 15.

## DEFENDANTS FRAUDULENTLY BREACHED THEIR PROMISES TO MR. JARAMILLO WHEN THEY HIRED HIM

24.     In January 2019, Mr. Jaramillo was employed by Wynn Resorts. At that time, Andrea Wasser and Pat Haro, on behalf of Defendants, told Mr. Jaramillo that Defendants were looking to fill the position of event operations manager for AREA 15, a new project in Las Vegas.

25.     Mr. Jaramillo was content at Wynn Resorts, but Ms. Wasser and Mr. Haro persisted; they were insistent that Mr. Jaramillo would be a good fit for Defendants' new company. They said that Defendants were very well funded by the FB Individual Defendants and would be more than happy to start Mr. Jaramillo at $100,000 per year or more.

26.     Mr. Jaramillo agreed to meet with Ryan Kruger ("Mr. Kruger"), Defendants' Managing Director of Events & Entertainment for AREA 15. Following that meeting, Mr. Kruger hired Mr. Jaramillo as AREA 15's event operations manager, starting on March 18, 2019. Defendants agreed to pay Mr. Jaramillo a salary of $100,000 per year and a 20% annual bonus. Mr. Jaramillo's base salary would be reviewed for increases each January.

27.     Mr. Jaramillo was scheduled to receive a raise on April 16, 2020. However, **Defendants unilaterally rescinded the promised raise**. The reason Defendants gave Mr. Jaramillo for denying his raise was due to COVID-related budget cuts. That excuse made no sense. AREA 15 was not even open and operating at that time and was therefore not affected by the pandemic.

28.     Defendants told Mr. Jaramillo that everyone at AREA 15 who was making $100,000 or more would be getting a 10% pay cut. Mr. Jaramillo therefore ended up making less money than he was when he was originally hired. Mr. Jaramillo had to stop contributions to his 401(k) plan to account for Defendants' unilateral retraction.

**AMENDED COMPLAINT**

6

29.     Defendants never intended to permanently pay Mr. Jaramillo a six-figure salary with lucrative bonuses and pay raises as they had promised him, and which Mr. Jaramillo relied upon when Defendants hired him. Nevertheless, Mr. Jaramillo relied, to his detriment, upon Defendants' promises and left Wynn, one of the world's top-rated resorts.

30.     Thereafter, Mr. Jaramillo learned that Defendants paid other similarly situated AREA 15 employees more money than him. Upon Mr. Kruger's exit from AREA 15, James Heilmann ("Mr. Heilmann"), AREA 15's general manager, assumed the supervisory role of Mr. Jaramillo. At the outset, Mr. Heilmann engaged in a unique management approach that intentionally marginalized gays and people of color.

31.     Mr. Heilmann told Mr. Jaramillo to put the hardship of the pay cut in perspective, "Think of it this way; this is an investment in your future. "**[You aren't] going anywhere** … Not only will you **be here for as long as you want,** you'll be making much more than $175,000 after COVID."

32.     Defendants never intended to fulfill their promise, through Mr. Heilmann, to keep Mr. Jaramillo at AREA 15 as long as he wanted. Mr. Jaramillo relied on those false promises by not protesting the salary reduction.

33.     NRS 613.010 protects employees like Mr. Jaramillo from false representations intended to induce them to change employers. Defendants through their false representations of pay and tenure violated NRS 613.010.

**DEFENDANTS DISCRIMINATED AGAINST MR. JARAMILLO BASED ON HIS RACE**

34.     Defendants consistently and routinely discriminated against Mr. Jaramillo because of his race. The discrimination was ongoing and increased in frequency and severity over time. Ultimately, the heinous acts of racism led Mr. Jaramillo to attempt to resolve the abuse with his boss' boss, Defendants' COO, Dan Pelson ("Mr. Pelson"). But Mr. Jaramillo's attempt to stop the racism resulted in his pretextual termination.

35.     Mr. Jaramillo was tasked by AREA 15 to screen applicants who would be hired to report to Mr. Kruger like, for example, the head of talent. Mr. Jaramillo determined who was potentially a good hire and forwarded those applicants to Mr. Kruger. In effect, Mr. Jaramillo would maintain seniority over those employees hired after him.

**AMENDED COMPLAINT**

7

36.     One such candidate was Howard Weiss ("Mr. Weiss"). Mr. Jaramillo ultimately learned that Defendants were paying Mr. Weiss, a Caucasian male, significantly more money than Defendants paid him. Defendants also gave Mr. Weiss preferential treatment. Defendants offered Mr. Weiss Mr. Kruger's former office, a perk highly sought-after by Mr. Weiss and Mr. Jaramillo. The higher salary and perk were given to Mr. Weiss, despite the fact that Mr. Jaramillo had more seniority, had the same leadership level, and Mr. Jaramillo supervised more employees.

37.     **Defendants underpaid Black employees** like Sequoah Turner and Arthur Lindsay ("Mr. Lindsay") in comparison to other white AREA 15 employees in similarly situated employment. **Defendants also paid Mr. Jaramillo less than white coworkers** in similarly situated positions.

38.     Mr. Weiss, Victoria Paul ("Ms. Paul"), and Ms. Turner were also promoted to directors. However, Ms. Turner was **paid less money than her white subordinate, and Mr. Jaramillo was paid less than his white peer, Mr. Weiss**.

39.     Defendants also paid AREA 15 employee Valmira Mavraj, a white employee, more than Mr. Jaramillo, even though Mr. Jaramillo was Ms. Mavraj's supervisor. Mr. Jaramillo's salary was adjusted only after he complained about this inequity.

40.     During a June 23, 2020, meeting, Mr. Jaramillo told Mr. Heilmann it was not right that some AREA 15 employees of color made substantially less money than their white peers. Mr. Heilmann falsely stated that everyone at the director level made the same amount of money. But Mr. Jaramillo knew, and pointed out to Mr. Heilmann, that Defendants Ms. Turner (Black), and him (Hispanic) were paid significantly less than their white peers.

41.     AREA 15's Senior Sales Manager, Josh Baro ("Mr. Baro") became a nonstop source of problems in the AREA 15 office. For example, **Mr. Baro once ran into Mr. Jaramillo's office waving a .44 magnum handgun**. Obviously, this made Mr. Jaramillo very uncomfortable in light of the recent mass shooting that took place in Las Vegas. Mr. Jaramillo made it abundantly clear to Mr. Baro that he did not approve of Mr. Baro bringing his firearm to work.

42.     Mr. Jaramillo told Mr. Heilmann about this incident. Mr. Heilmann was dismissive of Mr. Jaramillo's concern regarding office safety. He told Mr. Jaramillo that he "overreacted" to Mr. Baro bringing his gun into the office, saying "it was not a big deal."

43.     Appallingly, Mr. Heilmann told Mr. Jaramillo he did not worry about the gun because "Josh (Mr. Baro) only shoots cans." When Mr. Jaramillo looked puzzled at the statement, Mr. Heilmann clarified, "You know… **MexiCANS, AfriCANS, Puerto RiCANS.**" This perpetuated and

**AMENDED COMPLAINT**

8

condoned a dangerous and racist behavior and allowed a dangerous threat to Mr. Jaramillo to continue.

44. Mr. Heilmann then just laughed. Mr. Jaramillo told Mr. Heilmann how incredibly inappropriate his response was. He advised Mr. Heilmann how offensive his racist remarks were, in light of Mr. Jaramillo's race. But Mr. Heilmann just laughed louder, in an exaggerated fashion. Mr. Jaramillo felt insulted, undermined, and threatened by this incident.

45. Mr. Jaramillo turned to Mr. Kruger for assistance in further dealing with Mr. Heilmann's actions. Mr. Heilmann did not like the fact that Mr. Jaramillo told Mr. Kruger about Mr. Baro's discriminatory jokes. Mr. Heilmann told Mr. Jaramillo, "**People like you are so easily offended,**" and "**You all get your panties in a wad over nothing.**"

46. AREA 15's racist environment was menacing and insulting to Mr. Jaramillo even when the racism was not aimed directly at him. By this time, African-American AREA 15 employee Mr. Lindsay also complained about racist comments made about Jewish people. Mr. Lindsay complained to Mr. Jaramillo about the micro-aggressions he experienced at AREA 15 because he was Black. Mr. Jaramillo then advised Mr. Heilmann about this racism against Mr. Lindsay.

47. Mr. Jaramillo was told by another Black AREA 15 employee that the AREA 15 Las Vegas warehouse, where people of color worked, was not airconditioned, whereas the warehouse where Caucasian workers worked was airconditioned.

48. Mr. Baro shared **insulting and demeaning jokes about Jews** with a Jewish AREA 15 employee Lindsey Allen ("Ms. Allen"). Ms. Allen was AREA 15's Food and Beverage manager. When Ms. Allen told Mr. Baro to stop making these religious jokes, Mr. Baro just "doubled-down" by firing off more jokes in quick succession.

49. Mr. Heilmann said he would deal with these complaints of discrimination. But he did nothing about them. Mr. Lindsay and Ms. Allen then brought the issue to Mr. Jaramillo who emailed Mr. Kruger to let him know about Mr. Baro's inappropriate behavior. But Mr. Heilmann simply said, "**Jews in *this* place seem to be doing just fine.**"

50. Asian-American AREA 15 employee Helen Stahl also complained to Ryan Kruger that Josh Baro was harassing her. **Defendants fired Ms. Stahl as well as Sarah Carrier, a lesbian.**

51. Time and time again, Mssrs. Heilmann, Pelson, Mark Stutzman ("Mr. Stutzman"), AREA 15's CTO, and other leaders in the company simply recognized and excused Mr. Baro's behavior saying that "**Baro's [behavior] was worth it if he could produce sales.**"

**AMENDED COMPLAINT**

9

52.     Mr. Lindsay became frustrated at Mssrs. Heilmann, Pelson, and Stutzmans' refusal to do anything about the uncomfortable and hostile office environment created by Mr. Baro's inappropriate behavior. He also expressed concern about Defendants' other inappropriate conduct, stating, **"dropping off duffle bags of cash" was not the appropriate way to deal with city officials**. In the face of expressing his concerns of microaggression, Mr. Lindsay was told not to "come across so angry."

53.     Mr. Baro made other racist remarks. After he shaved his head, he made a joke on a Zoom call, which included Mr. Heilmann, about his new "**skinhead**" appearance that made Black AREA 15 employee Ms. Turner and Hispanic employee Mr. Jaramillo very uncomfortable.

54.     Both Ms. Turner and Mr. Jaramillo asked Mr. Heilmann to address this "skinhead" comment with Mr. Baro. Mr. Heilmann replied that **Sequoah (Ms. Turner) was "pulling the race card again"** and did not see how the incident was offensive.

55.     **Winston Fisher discriminated against people of color**. Mr. Jaramillo had arranged for UNLV administrators to tour the AREA 15 site with Winston Fisher. **Mr. Fisher pointed at the construction fence and the Mexican workers on the other side of the fence and said, "That's our own version of the border wall."** When Mr. Jaramillo told Mr. Fisher how uncomfortable his comment made him and the UNLV guests feel, **Mr. Fisher simply stated, "Oh, come on. Doesn't everyone want them [referring to the Mexicans] on the other side**?"

56.     AREA 15 employee Ashley Glover was also subject to disparate treatment because of her race at the hands of the Defendants, as was David Frank, who worked for FB companies in New York.

57.     Things changed for the worse for Mr. Jaramillo when he raised concerns regarding racial discrimination. Mr. Jaramillo complained to Mr. Heilmann about Mr. Baro's inappropriate comments. Mr. Heilmann told Mr. Jaramillo that "**Someone like you should be happy to have a job at all.**"

58.     Mr. Baro, knowing that Mr. Jaramillo was gay and knowing that Chick-fil-A Restaurants are reputedly anti-Gay, frequently proclaimed to the entire office, "I'm on my way to eat at Chick-fil-A for lunch." He would then mockingly ask if Mr. Jaramillo wanted to go with him. He did so intentionally within earshot of Mr. Jaramillo and the office staff.

59.     As far as Mr. Jaramillo knows, he was the only gay person in the office at the time. Mr. Baro made the comments to annoy and undermine Mr. Jaramillo. Mr. Jaramillo told Mr. Baro

**AMENDED COMPLAINT**

10

that these loud references to Chick-fil-A were offensive to him and asked Mr. Baro not to make them. However, Mr. Baro ignored Mr. Jaramillo's requests.

60.     Rather than assisting Mr. Jaramillo with Mr. Baro's Chick-fil-A references, Mr. Heilmann went into Mr. Jaramillo's office, closed the door behind him, and told Mr. Jaramillo he should **keep his "gayness" to himself around "the guys" because "we don't like that.**" Mr. Jaramillo felt marginalized and undermined, as well as further abused by Mr. Heilmann's outrageous directive.

61.     Mr. Jaramillo responded to Mr. Heilmann by telling him that he kept his personal life private; it was Mr. Baro who repeatedly harassed him for being gay. Mr. Heilmann walked away from Mr. Jaramillo stating, "**Guys will be guys and gays will be gays.**"

62.     While walking the property with Mr. Heilmann and Mr. Baro during the setup for an AREA 15 event on March 10, 2020, a significant number of Hispanic construction workers were busily working in the area. Mr. Baro and Mr. Heilmann, both knew Mr. Jaramillo was of Hispanic descent. Mr. Heilmann said loudly, "**It is a good thing that we have all those Mexicans out there,**" and "they better hurry to be ready for the party." Mr. Heilmann also loudly stated to Mr. Jaramillo, "**that's what Mexicans are for – to do our work**!" Mr. Baro and Mr. Heilmann then both laughed.

63.     On June 30, 2020, during a Zoom call with Mr. Weiss, Glenn Turell, Defendants' Vice President of Finance, and Mr. Heilmann, Mr. Heilmann took the opportunity to allege what he knew was a lie by claiming that Mr. Jaramillo had "dropped the ball" in getting AREA 15's liquor storage area built out and approved by the City of Las Vegas. Mr. Heilmann could not have been more wrong. The liquor storage project had been assigned to Ms. Paul, not Mr. Jaramillo, and the project was well under way. Mr. Jaramillo calmly reminded Mr. Heilmann of those facts.

64.     Mr. Heilmann was unphased. He persisted in stating that Mr. Jaramillo "dropped the ball" and needed to handle the situation. **Thus, Defendants created a false narrative** that Mr. Jaramillo had mishandled an assignment, when Defendants knew that was a lie. **Defendants perpetuated the lie in order to undermine Mr. Jaramillo and facilitate their ability to fabricate a pretextual reason to fire Mr. Jaramillo.**

65.     After the Zoom meeting, Mr. Heilmann called Mr. Jaramillo. Mr. Heilmann was livid. He told Mr. Jaramillo that "**a Mexican fag" like [you] had "no place backtalking his boss in front of the guys.**" Mr. Heilmann's use of the term "the guys" meant to exclude Mr. Jaramillo because **a gay Hispanic male would never be one of "the guys."**

**AMENDED COMPLAINT**

11

66. Mr. Jaramillo was shocked and truly traumatized by Mr. Heilmann's unfettered and vile attack. Finally, Mr. Heilmann insulted Mr. Jaramillo again by asking him in a sarcastic tone, "**comprende**?" Mr. Heilmann meant this comment derogatorily to again discriminate against Mr. Jaramillo because of race.

### MR. JARAMILLO WOULD NOT HAVE BEEN TERMINATED BUT FOR HIS RACE, RACISM, AND HIS COMPLAINTS OF RACISM BY AREA 15 AND FISHER BROTHERS

67. Defendants' termination of Mr. Jaramillo was an orchestrated and pretextual termination that would not have occurred but for Mr. Jaramillo's race.

68. Defendants had praised Mr. Jaramillo for his stellar work and gave him a raise to "thank [him] for [his] hard work and contributions to the team."

69. Defendants also gave Mr. Jaramillo additional responsibility, including an additional employee to supervise and promoted him to "Director of Event Operations." Defendants told Mr. Jaramillo his pay would be increased to $175,000 with a bonus structure.

70. Defendants never expressed any concern about Mr. Jaramillo's performance and not once did Defendants give any legitimate reason terminating his employment at AREA 15. Indeed, Defendants' only performance review of Mr. Jaramillo stated that **Mr. Jaramillo exceeded all expectations**.

71. Mr. Jaramillo responded to acts of racism and discrimination by asking for improvement in the way AREA 15 treated employees of color, including himself. Mr. Jaramillo pushed for equal pay, equal work conditions, appropriate HR supervision, and corporate oversight and accountability. And as soon as Mr. Jaramillo attempted to report the abuse to management above Mr. Heilmann, he was terminated, with the knowledge, approval, and participation of Defendants.

72. Shortly after Mr. Heilmann called Mr. Jaramillo "a Mexican fag," Mr. Jaramillo emailed Mr. Pelson to expose the ongoing racial discrimination and other issues. Mr. Jaramillo believed that Mr. Pelson would take action to stop the ongoing discrimination. However, no action was taken by Defendants.

73. Defendants never investigated the veracity of Mr. Jaramillo's allegations of discrimination. They never interviewed Mr. Jaramillo about the discrimination aimed at him. He is unaware of any efforts by Defendants to interview any other victim of discrimination.

74. Defendants tolerated the discriminatory behaviors of Mr. Baro, Mr. Heilmann, and others because they were White males. Time and time again, Defendants ratified rather than rectified

**AMENDED COMPLAINT**

12

abusive and discriminatory behaviors and policies without concern for the safety and well-being of their minority employees. Mssrs. Heilmann, Pelson, and Stutzman excused Mr. Baro's behavior because he produced sales, despite the fact that Baro was not a top producer and that, in any event, such reason is no justification at all.

75.    A review of the timeline of Mr. Jaramillo's termination underscores the reality that he was not terminated for cause, or for no reason at all (at will). His termination was pretextual and it camouflaged the systemic racism that was carried out by Defendants at all levels.

76.    Before and during the eight (8) business days between June 30, 2020, when Mr. Heilmann called Mr. Jaramillo "a Mexican Fag," and July 10, 2020, when Mr. Jaramillo was terminated, Defendants had never talked to Mr. Jaramillo about any deficiencies in his work; he had never been "written up," nor given any PIPs (Personal Improvement Plans).

77.    Defendants never gave Mr. Jaramillo any opportunity to address any shortcomings on his part. In fact, when Mr. Jaramillo called Mr. Heilmann's boss, Mr. Pelson, a short time after Mr. Heilmann called Mr. Jaramillo a "Mexican Fag" to complain about the incessant racism, Mr. Pelson returned Mr. Jaramillo's call within three (3) hours and set a meeting with Mr. Jaramillo for the upcoming Tuesday, July 14, 2020, at 3:00 P.M.  Mr. Jaramillo was assured that this was to be a weekly recurring meeting.

78.    It turns out that, long before his scheduled meeting with Mr. Pelson, Mr. Jaramillo was already a "dead man walking." Emails between James Heilmann and Fisher Brothers HR manager Susan Dalton confirm that **Defendants had already hired a replacement for Mr. Jaramillo before Mr. Jaramillo had even made contact with Mr. Pelson**. Defendants had contrived to terminate Mr. Jaramillo immediately after Mr. Heilmann had called him a Mexican Fag.

79.    Defendants' offer letter to Mr. Jaramillo's replacement was dated the very same day that Mr. Pelson scheduled his meeting with Mr. Jaramillo. On June 9, 2020, the day after Mr. Pelson had scheduled that meeting, knowing that it was never going to take place, Defendants agreed and communicated with each other that Mr. Jaramillo would be fired on June 10, 2020.  Prior to the date of Mr. Jaramillo's termination, Defendants went back and forth about the verbiage of his "resignation." These communications confirm Defendants' lack of integrity and honesty toward Mr. Jaramillo. **These actions glaringly point to the fact that Mr. Jaramillo's termination was contrived and pretextual, and not based on his performance and that, if Defendants had**

**AMENDED COMPLAINT**

13

**anything to do with it, his complaints of racism and other discrimination would never see the light of day.**

80. Mr. Pelson, Mr. Heilmann, Susan Dalton, Winston Fisher, and the other Defendants sandbagged Mr. Jaramillo into thinking they would address his complaints of rampant discrimination. Instead, they simply got rid of the squeaky wheel. Once they scheduled Mr. Jaramillo's meeting with Mr. Pelson, they proceeded with their pretextual narrative to try and explain why Mr. Jaramillo was no longer employed by Defendants.

81. Defendant Fisher Brothers Management was involved in the decision to terminate Mr. Jaramillo. This is even evidenced by their post-termination conduct whereby Defendants' executives asked the Nevada State Unemployment Department that was handling Mr. Jaramillo's claim to **send all notices regarding Mr. Jaramillo's unemployment claim to Fisher Brothers' New York office**.

82. There was no legitimate cause for Mr. Jaramillo's termination, none! Defendants' fabricated reasons for terminating Mr. Jaramillo were all over the map. Defendants claimed Mr. Jaramillo was fired for sub-par performance. But, Defendants also told others that Mr. Jaramillo quit; that he didn't need to work. Then Defendants said Mr. Jaramillo was an at-will employee and, therefore, they did not need a reason to terminate him.

83. On the day Mr. Jaramillo was fired, Mr. Heilmann informed AREA 15 employees and Defendants, as if they did not already know, that it was Mr. Jaramillo's last day at AREA 15. Mr. Heilmann's email stated, "I know we have all enjoyed getting to know George during his time with the company, and we sincerely appreciate his contribution to our pre-opening efforts. I wish him all the best in his future endeavors."

84. This email message by Mr. Heilmann that spoke so positively about Mr. Jaramillo's work at AREA 15, certainly did not imply that Mr. Heilmann had fired Mr. Jaramillo. To the contrary, Mr. Heilmann describes an employee in Mr. Jaramillo who is not worthy of termination. Why is that? In their inter-office communications, Defendants admitted they had dropped the ball in their response to Mr. Jaramillo's complaints of discrimination.

85. In the final analysis, the only legitimate explanation for Mr. Jaramillo's termination and the dishonest way it was carried out, comes down to his attempt to complain to Defendants of racial discrimination. Defendants responded by contriving a deceitful plan to trick Mr. Jaramillo into staying quiet at AREA 15 long enough to fire him and come up with a pretext as to why they did so.

**AMENDED COMPLAINT**

14

 Exhibit 2 - Page 15 of 34

This provided Defendants' an opportunity to avoid the airing of their racist dirty laundry and escape responsibility and public awareness of their discriminatory deeds.

### DEFENDANTS REFUSED TO TIMELY PAY MR. JARAMILLO AND RETURN HIS PERSONAL PROPERTY

86.     Defendants' malicious, abusive, and discriminatory acts continued even after they fired Mr. Jaramillo. To add salt to Mr. Jaramillo's wounds, Defendants withheld Mr. Jaramillo's final paycheck and COBRA rights. Also and, but for Mr. Jaramillo's race, Defendants would not have stolen Mr. Jaramillo's property, which contained documented evidence of many racist acts and other inappropriate acts on the part of Defendants.

87.     It took more than one month for Fisher Brothers to send Mr. Jaramillo COBRA forms. And Ms. Dalton claimed she made a direct deposit in the amount of $3,112.62, which she stated was his "final check," because Ms. Dalton had "misspelled" Mr. Jaramillo's address on the envelope.

88.     Mr. Jaramillo had provided Defendants with his accurate address on various forms since being hired. Mr. Jaramillo believes the letter intentionally misspelled the address so that it would not be deliverable and thus Defendants intentionally withheld important information regarding Mr. Jaramillo's medical insurance during a global pandemic. Defendants also never gave Mr. Jaramillo the W-2 Form they owed him.

89.     Mr. Jaramillo needed all of his property returned. However, it was most concerning to him that his notebook was missing. This composition style book was where he kept notes of racial abuses and other problems he witnessed being carried out by Defendants. He believes that Mr. Heilmann saw it and realized what it would mean for him and Defendants if the notebook was returned to Mr. Jaramillo. Mr. Heilmann therefore had to dispose of it. On the date of his termination, Mr. Jaramillo emailed Mr. Heilmann and asked to be allowed to pick up his personal property that day. Despite this, Mr. Jaramillo was never allowed to pick up his property.

90.     On August 21, 2020, Mr. Jaramillo emailed Ms. Dalton to advise her that Defendants had still not completely paid him what he was owed; that his personal property was still missing; and that, despite his multiple previous requests, Defendants had not given him a copy of his personnel file.

91.     On September 2, 2020, Defendants agreed to forward a check to Mr. Jaramillo for $300 to compensate him for his stolen property. Because it was clear by then that Defendants were

**AMENDED COMPLAINT**

15

Exhibit 2 - Page 16 of 34

not going to do the right thing by returning Mr. Jaramillo's stolen property, Mr. Jaramillo, on September 24, 2020, filed a police report with the Las Vegas Metropolitan Police Department.

92.     Ms. Dalton emailed Mr. Jaramillo to defend Defendants' attorney. She wrongly claimed that Defendants sent Mr. Jaramillo his personnel file and that there was "no other documentation to be sent," that Defendants did not have a signed copy of Mr. Jaramillo's evaluation as completed by Mr. Kruger, and that it was not Defendants' intention to disparage or tarnish Mr. Jaramillo's reputation.

93.     Ms. Dalton attached to her email a non-disclosure agreement that Defendants asked Mr. Jaramillo to sign if he wanted to receive unemployment benefits. Knowing that Mr. Jaramillo could not sign such an agreement, Defendants sent it in an attempt to prevent Mr. Jaramillo from receiving unemployment benefits.

94.     While Mr. Jaramillo was eligible for unemployment benefits since the end of July 2020, he did not receive a single cent for over four (4) months. The stress of going months without income to which he was entitled was severe.

95.     When Mr. Jaramillo complained to the appropriate agency about Defendants' delay, Defendants responded by defaming Mr. Jaramillo by stating he was terminated for cause. Ultimately, Mr. Jaramillo was able to collect unemployment benefits because Defendants could not provide any factual basis and documentation for their false assertion.

96.     On November 16, 2020, the Nevada Unemployment Insurance Office advised Mr. Jaramillo that "You were discharged due to poor work performance. The employer did not cite the details regarding a specific final incident or prior incidents and warnings. You state that you were not informed of a final incident that caused your discharge. As misconduct in connection with the work has not been established, no disqualification will be assessed."

97.     Defendants have literally, for now and for the foreseeable future, without any basis, destroyed Mr. Jaramillo's professional life. Defendants have ruined Mr. Jaramillo's reputation, which is key in his profession of event planning and hospitality. The Covid-19 pandemic further complicated a comeback from his wrongful termination. There are no jobs like the one Mr. Jaramillo held.

98.     Although Defendants touted AREA 15 as a paragon of acceptance and tolerance, the reality is that AREA 15 is a perfect example of how blatant prejudice, harassment, and discrimination can harm people, as it did Mr. Jaramillo and other employees at AREA 15. The Fishers, the

**AMENDED COMPLAINT**

16

billionaire owners of AREA 15, run AREA 15 in a way that shows that the lives of their White-male, straight employees matter but the lives of women, people of color, and LGBTQ+ employees do not matter. In fact, instead of trying to rectify their racism and other bad acts, Defendants have done everything to hide their racism and bad behavior under the proverbial rug.

99.     Mr. Jaramillo was in his early thirties when first employed by Defendants. The stress and toxic atmosphere at AREA 15 literally gave Mr. Jaramillo heart problems to the point that he had to see a cardiologist. He gained so much weight that he was the heaviest he had been in his entire life. This resulted in diabetes.

100.     Mr. Jaramillo suffered depression and had chronic headaches. He is on heart and diabetes medication to this day. This was never the case before working at AREA 15, having to endure prolonged and repeated discrimination and abuse.

**FIRST CLAIM FOR RELIEF**
**EMPLOYMENT DISCRIMINATION BASED ON RACE**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

101.     Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 102 with the same force and effect as though fully set forth herein.

102.     Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their race.

103.     Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of racial discrimination.

104.     Defendants failed to take reasonably adequate steps to prevent racial discrimination in their workplace in the State of Nevada.

105.     Defendants knew, at all times, that Mr. Jaramillo was of Hispanic origin. Defendants, acting through and with their employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment including, but not limited to, making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his Race.

106.     Defendants' discriminatory conduct includes, but is not limited to:

**AMENDED COMPLAINT**

17

A.    Mr. Heilmann told Mr. Jaramillo he did not worry about Josh Baro bringing a gun to the office because he "only shoots cans." **MexiCANS, AfriCANS, Puerto RiCANS."**

B.    **Jews in *this* place seem to be doing just fine.**"

C.    "**It is a good thing that we have all those Mexicans out there - that's what Mexicans are for – to do our work**!"

D.    **"…a Mexican fag" like [you] had "no place backtalking his boss in front of the guys".**

E.    Defendants underpaid Black employees and paid Mr. Jaramillo less than White coworkers in similarly situated jobs.

F.    Mr. Baro shared insulting and demeaning jokes about Jews.

G.    Mr. Heilmann accused Sequoah Turner of pulling "the race card."

H.    Mr. Fisher pointed at the construction fence and the Mexican workers on the other side of the fence and said, "That's our own version of the border wall … Doesn't everyone want them [referring to the Mexicans] on the other side?"

I.    "A Mexican fag" like [you] had "no place backtalking his boss in front of the guys … comprende?"

J.    Defendants provided Howard Weiss, a White male, additional perks and paid him more money than Mr. Jaramillo, a Hispanic male. This salary disparity was paid despite the fact that Mr. Jaramillo had seniority, was at the same leadership level as Mr. Weiss, and despite the fact that Mr. Jaramillo supervised more employees.

K.    Defendants also paid AREA 15 employee Valmira Mavraj (a White employee) more than Mr. Jaramillo, even though Mr. Jaramillo was Ms. Mavraj's supervisor.

L.    Defendants dismissed Mr. Jaramillo's concerns with statements like "**Someone like you (Mr. Jaramillo) should be happy to have a job at all.**"

M.    Defendants created a false and pretextual narrative that Mr. Jaramillo had mishandled an assignment, when Defendants knew that was a lie. Defendants perpetuated the lie in order to fabricate a reason to fire Mr. Jaramillo because he was Hispanic, and they wanted to avoid his ability to seek redress.

**AMENDED COMPLAINT**

18

N.   Mr. Baro made a joke on a Zoom call about his new "**skinhead**" appearance that made Black AREA 15 employee Sequoah Turner and gay, Hispanic employee Mr. Jaramillo very uncomfortable.

107.   Defendants, acting through and with their employees and agents, discriminated illegally against Mr. Jaramillo because their remarks were not directed to similarly situated non-Hispanic employees.

108.   But for Defendants' racial discrimination against Mr. Jaramillo and his complaints about discriminatory conduct, Mr. Jaramillo would still be employed by AREA 15 and earning the salary and bonuses he was promised.

109.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future.

110.   The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

111.   As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

## SECOND CLAIM FOR RELIEF
## EMPLOYMENT DISCRIMINATION BASED ON SEXUAL ORIENTATION
## TITLE VII (42 U.S.C. § 2000e-2)
## AGAINST ALL DEFENDANTS

112.   Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 113 with the same force and effect as though fully set forth herein.

113.   Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their sexual orientation.

114.   Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of sexual orientation discrimination.

**AMENDED COMPLAINT**

19

115.     Defendants failed to take reasonably adequate steps to prevent discrimination based upon sexual orientation in its workplace in the State of Nevada.

116.     Defendants, at all times relevant, knew that Mr. Jaramillo was gay. Defendants, acting through and with their employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including but not limited to making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his sexual orientation.

117.     Defendants' discriminatory remarks include, but are not limited to:

A.     "People like you are so easily offended."

B.     "Keep your "gayness" to yourself around "the guys" because "we don't like that."

C.     "Guys will be guys and gays will be gays."

D.     "A Mexican fag" like you has no place backtalking his boss in front of the guys."

E.     "Someone like you should be happy to have a job at all."

F.     Taunting with loud and false invitations to lunches at Chick-fil-A, knowing that restaurant is known for being anti-gay.

118.     Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo simply because he is gay.

119.     Defendants, acting through and with their employees, discriminated illegally against Mr. Jaramillo because their remarks were not directed to similarly situated non-gay employees.

120.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future.

121.     The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

**AMENDED COMPLAINT**

20

122.     As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**THIRD CLAIM FOR RELIEF**
**HOSTILE WORK ENVIRONMENT**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

123.     Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 124 with the same force and effect as though fully set forth herein.

124.     Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their race or sexual orientation.

125.     Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of discrimination.

126.     Defendants knew at all times that Mr. Jaramillo was gay and of Hispanic race. Defendants, acting through and with their employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including but not limited to making remarks intended to humiliate Mr. Jaramillo, denying him benefits, and denying him the same rights and privileges of other employees due to his sexual orientation and Race.

127.     Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo. The remarks were unwelcomed by Mr. Jaramillo and were sufficiently severe and pervasive so as to alter the conditions of Mr. Jaramillo's employment and create an abusive working environment.

128.     Defendants' comments and actions were so severe and pervasive as to pollute Mr. Jaramillo's workplace, making it more difficult for him to do his job free from discriminatory intrusions and ultimately to retain his job.

129.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future.

**AMENDED COMPLAINT**

21

130.     The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

131.     As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**RETALIATION FOR REPORTING DISCRIMINATION**
**BASED ON RACE**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

132.     Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 133 with the same force and effect as though fully set forth herein.

133.     Mr. Jaramillo complained to management of AREA 15 about the unlawful employment practices that discriminate against persons on the bases of their sexual orientation and race.

134.     There was a causal link between Mr. Jaramillo complaining about discrimination and his termination. In other words, Defendants retaliated against Mr. Jaramillo's protected reporting of discrimination by firing him.

135.     Mr. Jaramillo would not have been fired if he had not reported Defendants' unlawful discrimination.

136.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future.

137.     The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

138.     As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated

**AMENDED COMPLAINT**

22

Exhibit 2 - Page 23 of 34

for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

### FIFTH CLAIM FOR RELIEF
### WRONGFUL TERMINATION
### AGAINST DEFENDANTS AREA 15 AND DOES 1-50

139. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 140 with the same force and effect as though fully set forth herein.

140. Defendants AREA 15 AND DOES 1-50 engaged in discriminatory, retaliatory, and wrongful acts, based upon Mr. Jaramillo's race and sexual orientation.

141. Mr. Jaramillo expressed his concern to Defendants about this disparate treatment, his concern for his safety, the harassment he endured, and his inability to receive the same terms, conditions, and bonus payments of similarly situated White employees.

142. Defendants AREA 15 AND DOES 1-50, through their employees, including Mr. Heilmann, specifically promised Mr. Jaramillo that he could remain employed at AREA 15 "as long as he wanted to be."

143. Defendants AREA 15 AND DOES 1-7 promoted Mr. Jaramillo and gave him a raise. Defendants gave Mr. Jaramillo a glowing performance evaluation.

144. After receiving Mr. Jaramillo's complaints regarding pervasive racial discrimination and other abuses, Defendants AREA 15 AND DOES 1-50 engaged in discriminatory and retaliatory conduct by discharging Mr. Jaramillo and executing a scheme that would allow Defendants to present a pretextual termination as valid and prevent Mr. Jaramillo redress, as well as shield Defendants from accountability.

145. These discriminatory and retaliatory acts violate the public policy of the State of Nevada.

146. As a direct and proximate result of Defendants AREA 15 AND DOES 1-7's unlawful conduct, Mr. Jaramillo has been damaged in an amount to be proven at trial, plus pre- and post-judgment interest.

147. The acts, conduct, and behavior of Defendants AREA 15 AND DOES 1-7 were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

**AMENDED COMPLAINT**

23

Exhibit 2 - Page 24 of 34

148. As a direct and proximate result of Defendants AREA 15 AND DOES 1-7's actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim, and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

## SIXTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST ALL DEFENDANTS

149. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 150 with the same force and effect as though fully set forth herein.

150. Defendants' conduct was extreme and outrageous and performed with reckless disregard that such actions would cause emotional distress to Mr. Jaramillo.

151. Mr. Jaramillo suffered severe and extreme emotional distress as the direct and proximate result of Defendants' conduct in an amount to be proven at trial, plus pre- and post-judgment interest.

152. The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

153. As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution.

## SEVENTH CLAIM FOR RELIEF
## DISCRIMINATION PURSUANT TO NRS 613.330 et. seq.
### AGAINST ALL DEFENDANTS

154. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 155 with the same force and effect as though fully set forth herein.

155. The discrimination, denial of benefits, and retaliatory actions by Defendants, due to Mr. Jaramillo's race and sexual orientation, constitute unlawful discriminatory employment practices under the Nevada Equal Employment Opportunity Act – NRS 633.310 et. seq.

156. Mr. Jaramillo suffered severe and extreme emotional distress as the direct and proximate result of Defendant's conduct in an amount to be proven at trial.

**AMENDED COMPLAINT**

24

157. The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

158. As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution.

### EIGHTH CLAIM FOR RELIEF
### DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
### AGAINST ALL DEFENDANTS

159. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 160 with the same force and effect as though fully set forth herein.

160. Defendants' discrimination against Mr. Jaramillo is in violation of the rights of Mr. Jaramillo afforded him by the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

161. Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of discrimination based on race.

162. Defendants failed to take reasonably adequate steps to prevent discrimination based upon race in its workplace in the State of Nevada.

163. Defendants, acting through and with their employees and agents, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including but not limited to making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his Hispanic race.

164. Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo and to undermine his safety in the workplace.

165. Defendants further exemplified their racial discrimination by paying employees of color less than similarly situated White employees and withholding other benefits from Mr. Jaramillo because of his race, while providing these benefits to White employees.

166. Defendants, acting through and with their employees, unlawfully discriminated against Mr. Jaramillo because their remarks were not directed to similarly situated white employees.

**AMENDED COMPLAINT**

25

167.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future.

168.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

169.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

## NINTH CAUSE OF ACTION
## FRAUD
### AGAINST ALL DEFENDANTS

170.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 171 with the same force and effect as though fully set forth herein.

171.    In January 2019, Mr. Jaramillo was employed by Wynn Resorts. At that time, Andrea Wasser and Pat Haro, on behalf of Defendants, told Mr. Jaramillo that Defendants were looking to fill the position of event operations manager for a new project in Las Vegas.

172.    Mr. Jaramillo was content at Wynn Resorts, but Ms. Wasser and Mr. Haro persisted. They were insistent that Mr. Jaramillo would be a good fit for Defendants' new company. They said that Defendants were very well funded and would be more than happy to start Mr. Jaramillo at $100,000 per year or more.

173.    Defendants hired Mr. Jaramillo as AREA 15's event operations manager, starting on March 18, 2020. Defendants agreed to pay Mr. Jaramillo a salary of $100,000 per year and a 20% annual bonus. Mr. Jaramillo's base salary would be reviewed for increases each January.

174.    The reality is that after they hired Mr. Jaramillo, Defendants reduced his salary, not increased it. Thus, when Defendants' agents recruited Mr. Jaramillo by telling him Defendants were "very well-funded," Defendants misled Mr. Jaramillo into believing that being worth billions, they could weather economic downturns like the global pandemic without reducing Mr. Jaramillo's salary.

**AMENDED COMPLAINT**

26

175. Regarding Defendants' decrease in Mr. Jaramillo's pay, Mr. Heilmann continued to mislead Mr. Jaramillo. He told Mr. Jaramillo, "[You aren't] going anywhere," and that Mr. Jaramillo would be there "as long as you want to be/" Mr. Heilmann said, "Think of it this way; this is an investment in your future. Not only will you be here for as long as you want, you'll be making much more than $175,000 after COVID."

176. These statements were not true. Defendants paid Mr. Jaramillo less than straight, White coworkers. Mr. Heilmann falsely stated that everyone made the same amount of money. But Mr. Heilmann knew that Mr. Jaramillo's salary was nowhere near the amount of money others received.

177. Thus, Defendants' representations, through their agents, James Heilmann, Andrea Wasser, Pat Haro, and others, were false and Defendants knew and/or should have known the falsity of these statements at the time they were made.

178. Defendants never had any intention of paying Mr. Jaramillo what they promised him. Defendants then unlawfully terminated Mr. Jaramillo when he complained of the disparate treatment and discrimination.

179. Mr. Jaramillo relied on the representations of Defendants and otherwise would not have accepted employment with Defendants or remained employed by them, but for their repeated promises to him.

180. Mr. Jaramillo is informed and believes that Defendants read about his reputation as an events manager at Wynn Resorts from press releases by Wynn Resorts. Defendants used Mr. Jaramillo because of his reputation at Wynn to boost the image of AREA 15, then deprived Mr. Jaramillo of the payments and promotions they had promised him.

181. Defendants, through their discriminatory and fraudulent agent, Mr. Heilmann, defrauded Mr. Jaramillo of his promised salary, bonuses, and job at AREA 15 "for as long as he wanted."

182. NRS 613.010 prohibits employers from making false representations to a prospective employee to induce an employee to change employers. False representations under Section 613.010 include the salary of the employment.

183. NRS 613.070 allows an employee, like Mr. Jaramillo, to recover damages for injuries incurred by an employer's false representations that induced the employee to change employers.

184. Defendants misrepresented to Mr. Jaramillo that he would be paid $175,000 per year

**AMENDED COMPLAINT**

27

plus bonuses. Defendants misrepresented to Mr. Jaramillo that he would be employed at AREA 15 as long as he wanted.

185. Defendants never intended to fulfill their promises to Mr. Jaramillo. But Mr. Jaramillo relied upon those misrepresentations and left a wonderful job at Wynn Resorts.

186. As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has sustained and will continue to sustain economic damages in the form of current and future loss of income, bonuses, 401k contributions, and other employment-related benefits in an amount to be determined according to proof at trial.

187. As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also been damaged by loss of reputation and loss of ability to compete at the highest levels that he once did in his industry.

188. As a further proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry and mental distress, all in an amount to be determined by proof at trial.

189. As a further proximate result of the aforementioned wrongful conduct, Mr. Jaramillo has had to employ the services of attorneys to pursue his legal rights. Mr. Jaramillo therefore prays for reasonable costs and attorney fees against Defendants for his prosecution of this action.

190. The fraudulent, oppressive, and malicious manner in which Defendants engaged in the fraud, as described in this cause of action, additionally entitles Mr. Jaramillo to punitive damages in an amount to be determined according to proof at trial.

## TENTH CAUSE OF ACTION
### DEFAMATION PER SE
**AGAINST ALL DEFENDANTS**

191. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 192 with the same force and effect as though fully set forth herein.

192. Las Vegas is world-renown for its events and entertainment. Many consider it the entertainment capital of the world. As stated in full above, Mr. Jaramillo had a coveted job with Wynn Resorts when Defendants fraudulently lured him away from Wynn with promises of riches.

**AMENDED COMPLAINT**

28

Exhibit 2 - Page 29 of 34

193.     The Las Vegas event and entertainment industry is an industry of insiders and known players. Entertainment managers like Mr. Jaramillo are well-known in the industry. That is why Defendants were able to locate and recruit him.

194.     Because of the small, close-knit community of event and entertainment movers and shakers, once Defendants fired Mr. Jaramillo, and he was forced to file this lawsuit, he was not able to find work in the Las Vegas entertainment industry.

195.     Mr. Jaramillo knows that Defendants, through their agents, made false and defamatory statements to third parties, concerning him. Mr. Jaramillo believes those statements included that Mr. Jaramillo was terminated for cause. AREA 15 also told others that Mr. Jaramillo quit his job. Defendants told others still that Mr. Jaramillo was not competent in the performance of his duties at AREA 15.

196.     Mr. Jaramillo knows Defendants trashed his reputation in the Las Vegas event and entertainment industry, in part, because someone of his stellar background and experience at Wynn Resorts would be imminently hirable in any other Las Vegas venue. In fact, defendants actively sought out Mr. Jaramillo and hired him away from his long-term position at Wynn. But for Defendants' pretextual termination and defamatory comments about him he would have landed on his feet as an event manager at another Las Vegas venue.

197.     Defendants knew, or in the exercise of reasonable care should have known, that their statements were false. Defendants intended for third parties to falsely believe that Mr. Jaramillo was an incompetent employee.

198.     As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has sustained and will continue to sustain economic damages in the form of current and future loss of income, bonuses, 401k contributions, and other employment-related benefits in an amount to be determined according to proof at trial.

199.     As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also been damaged by loss of reputation and loss of ability to compete at the highest levels that he once did in his industry.

200.     As a further proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry, and mental distress, all in an amount to be determined by proof at trial.

**AMENDED COMPLAINT**

29

201. As a further proximate result of the aforementioned wrongful conduct, Mr. Jaramillo has had to employ the services of attorneys to pursue his legal rights. Mr. Jaramillo therefore prays for reasonable costs and attorney fees against Defendants for his prosecution of this action.

202. The fraudulent, oppressive, and malicious manner in which Defendants engaged in the fraud, as described in this cause of action, additionally entitles Mr. Jaramillo to punitive damages in an amount to be determined according to proof at trial.

### ELEVENTH CAUSE OF ACTION
### BREACH OF EMPLOYMENT CONTRACT
### AGAINST DEFENDANTS AREA 15 AND DOES 1-10

203. Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 204 with the same force and effect as though fully set forth herein.

204. Notwithstanding Mr. Jaramillo's written Offer of Employment from Defendants, he was not an "at-will" employee. Defendants hired Mr. Jaramillo as an executive – the AREA 15 Events Operations Manager and thereafter promoted him to Director of Event Operations. Defendants tasked Mr. Jaramillo with the responsibility of building what would be the event department at AREA 15. Because Mr. Jaramillo was a manager and department head at AREA 15, and because Defendants made certain guarantees to Mr. Jaramillo, Defendants could only terminate Mr. Jaramillo's employment for cause. No cause for termination was ever made known to Mr. Jaramillo.

205. Defendants' termination of Mr. Jaramillo was pretextual and was, in reality, in retaliation for his complaints about AREA 15 discrimination based on race and sexual orientation, not because he was an at-will employee.

206. Defendants, through their agent, Mr. Heilmann, promised Mr. Jaramillo he would have a job at AREA 15 for as long as he wanted. Therefore, Defendants could not fire Mr. Jaramillo as an at-will employee.

207. By terminating Mr. Jaramillo's employment with AREA 15, Defendants breached their employment agreement with Mr. Jaramillo and violated Federal and Nevada law.

208. Defendants' termination of Mr. Jaramillo's employment was a substantial factor in causing damage to Mr. Jaramillo by the loss of his salary at AREA 15, as well as bonuses, vacation and personal pay, health insurance coverage, 401k plan contributions, and other employment-related benefits.

**AMENDED COMPLAINT**

30

209.    As a further result of Defendants' breach, Mr. Jaramillo is deprived of his future salary, bonuses, and other employment-related benefits.

## TWELFTH CAUSE OF ACTION
## CONVERSION OF PERSONAL PROPERTY
### AGAINST ALL DEFENDANTS

210.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 211 with the same force and effect as though fully set forth herein.

211.    Mr. Jaramillo was given exclusive use of an office during his employment at AREA 15. Mr. Jaramillo kept personal belongings in his exclusive-use office, including:

A.    A greeting card from Glenn Turell, Defendants' Vice President of Finance, saying what a pleasure it was to work with Mr. Jaramillo;

B.    A composition notebook in which Mr. Jaramillo kept notes of, among other things, his mistreatment, race discrimination and other ongoing issues at AREA 15;

C.    Mr. Jaramillo's signed copy of his glowing performance review from his direct supervisor, which was the reason for his annual bonus;

D.    A certificate from Wynn Resorts outlining Mr. Jaramillo's stellar performance for that employer;

E.    An unopened bottle of Whiskey given to Mr. Jaramillo by Art Lindsay before his departure;

F.    Approximately 275 valuable business cards from various industry contacts; and

G.    Mr. Jaramillo's wireless phone charger.

212.    Defendants terminated Mr. Jaramillo's employment with AREA 15, while Mr. Jaramillo was working from home during the COVID-19 Pandemic. After Defendants fired Mr. Jaramillo, they refused his reasonable request to come into the AREA 15 office to retrieve is personal property. Mr. Jaramillo nevertheless requested that Defendants immediately return his property to him.

213.    After Defendants failed to return his property, Mr. Jaramillo complained to Defendants that they had no right to keep his property. Defendants then returned to Mr. Jaramillo

**AMENDED COMPLAINT**

31

only some of his property. Defendants converted Mr. Jaramillo's property to their own use, and for their own purpose.

214.    Despite Mr. Jaramillo's requests and demands (including the filing of a police report), Defendants have still failed to return Mr. Jaramillo's personal property.

215.    Defendants' action of wrongfully exerting dominion over Mr. Jaramillo's personal property, inconsistent with his title and rights thereto, and in defiance of such title and rights, constitutes a conversion of Mr. Jaramillo's property.

216.    Mr. Jaramillo prays for return of his property by Defendants.

217.    As a result of Defendants' conversion, Mr. Jaramillo has lost the value of his property from the time of conversion, plus interest.

218.    As a further result of Defendants' conversion, Mr. Jaramillo has sustained consequential damages other than loss of interest.

WHEREFORE, PLAINTIFF prays for judgment to be entered in his favor and against each of the Defendants as follows:

1.  For special damages for lost wages, bonuses, vacation pay, 401k compensation and other compensatory, and economic and special damages according to proof at trial, together with interest, penalties, and costs;

2.  For general and non-economic damages according to proof at trial;

3.  For attorney's fees according to proof at trial;

4.  For punitive damages as allowed by law and according to proof at trial;

5.  For return of Mr. Jaramillo's personal property, loss of use of the property, and consequential damages;

6.  For pre-judgment interest at the prevailing legal rate;

7.  For costs of suit; and

///

**AMENDED COMPLAINT**

32

8. For such other and further relief as this Court deems just and proper.

Dated:  June 27, 2022

                                               BROWN, CLARK, LE, AMES, STEDMAN &
                                               CEVALLOS LLP

                                               By: Edwin B. Brown
                                               Edwin B. Brown (*Pro Hac Vice*)
                                               22342 Avenida Empresa, Suite 125
                                               Rancho Santa Margarita, CA 92688

                                               KAPLAN COTTNER

                                               By: Kory L. Kaplan
                                               Kory L. Kaplan - Nevada Bar No. 13164
                                               10091 Park Run Drive, Suite 190
                                               Las Vegas, Nevada 89145
                                               *Attorneys for Plaintiff George Jaramillo*

**AMENDED COMPLAINT**

33